UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------X

ANDRE LEWIS,                                    04 Civ. 1117 (BSJ) (DFE)
            Petitioner,

      -against-                                 REPORT AND RECOMMENDATION
                                                TO JUDGE JONES

WILLIAM PHILLIPS, Acting
Superintendent, Green Haven
Correctional Facility,

            Respondent.
----------------------------X

DOUGLAS F. EATON, United States Magistrate Judge.

      Andre Lewis brings this *pro se* habeas petition, challenging
his conviction for depraved indifference murder after a 1996 jury
trial in Supreme Court, Bronx County.  Justice John P. Collins
imposed a sentence of 25 years to life.

      The Appellate Division unanimously affirmed the conviction.
*People v. Lewis*, 284 A.D.2d 172, 728 N.Y.S.2d 431 (1st Dept.
2001), *leave denied*, 97 N.Y.2d 706, 739 N.Y.S.2d 107 (Ct. App.
Jan. 10, 2002).  Lewis's conviction became final on April 10,
2002.

      On January 8, 2003, Lewis sent the Appellate Division a *pro
se* motion for *coram nobis* relief.  That motion was denied on
August 14, 2003.  *People v. Lewis*, 307 A.D.2d 1075, 764 N.Y.S.2d
673 (1st Dept. 2003), *leave denied*, 1 N.Y.3d 540, 775 N.Y.S.2d
245 (Ct. App. Nov. 5, 2003).

      Lewis then sent the Court a habeas petition dated November
10, 2003.  The Court's *Pro Se* Office received it on November 24,
2003.  In a letter to the Court dated August 10, 2004, Lewis
wrote:

            I would like to have my current habeas corpus
            petition held in abeyance in light of a
            recent New York Court of Appeals decision
            relating to a defendant's mens rea (mind set)
            in regards to depraved indifference murder
            and intentional murder (see, People v.
            Gonzalez, N.Y.L.J. March 26, 2004). [The
            official cite became 1 N.Y.3d 464, 775

                              1

N.Y.S.2d 224 (Ct. App. Mar. 25, 2004).]

In a Memorandum and Order dated August 13, 2004, Lewis's request for a stay of proceedings was granted.

On November 24, 2004, Lewis submitted a second *coram nobis* motion to the Appellate Division.  He asserted, for the first time, that the trial judge committed error by submitting the count of depraved indifference murder to the jury.  The Appellate Division treated this as a motion to reargue his prior *coram nobis* motion; it issued another denial on June 23, 2005. Lewis applied for leave to appeal further; on August 18, 2005, Associate Judge Carmen Beauchamp Ciparick ruled that a denial of *coram nobis* was not appealable.  *People v. Lewis*, 5 N.Y.3d 807, 803 N.Y.S.2d 36 (Ct. App.).

On September 23, 2005, Lewis sent the Court an amended habeas petition and a memorandum of law ("Pet. Memo.").  On December 12, 2005, Respondent filed an opposing affirmation which annexed a memorandum of law ("Resp. Memo.") and 13 exhibits. (The Court shall refer to certain of those exhibits as "Exh. _____.").  The Court received a traverse from Lewis on January 27, 2006.

The Bronx District Attorney's Office provided the Court with a seven-volume set of transcripts:
```
Vol. 1:   Suppression hearings
Vol. 2:   Jury selection
Vol. 3:   Trial
Vol. 4:   Post-Trial hearing
Vol. 5:   Post-Trial hearing (continued)
Vol. 6:   Post-Trial hearing (continued)
Vol. 7:   Pages 4, 18 and 19 are missing; Pages 2-12 contain
          Justice Collins's decision denying a new trial;
          Pages 13-29 contained the sentencing.
```
In each volume, the pagination begins anew at page 1.  Unless referred to a specific Volume, citations to "Tr." will mean Volume 3 (the transcript of the trial).

The amended petition asserts the following grounds, as stated in Lewis's own words:

(1) Whether the verdict was against the weight of the evidence.  Has the verdict resulted in the conviction of one who is actually innocent and Prosecutor did not prove the elements of depraved indifference murder.

(2) Whether the Prosecutor's comment during

summation[,] vouching for the credibility of his main
witness as well as mis-stating the legal standards of
proof beyond a reasonable doubt and the significance of
lack of evidence[,] constitute Prosecutorial
misconduct.

(2A) Whether the trial Judge compounded the prejudice
inflicted on the petitioner due to the Prosecutor's
mis-stating of various legal standards[,] by providing
improper instruction on reasonable doubt, lack of
evidence and identification.

(3) Whether the trial Judge's refusal to admit a police
report [that] was exculpatory in nature, constitute[s]
reversible error.

(4) Whether Petitioner's sentence [should] be reduced
due to impermissible consideration by sentencing Judge
of claims by Prosecutor that he had allegedly found an
unnamed eyewitness, who stated Petitioner was the
perpetrator of the instant offense.

(Pet. Memo., p. 1.)

Ground One's phrase "actually innocent" refers primarily to
Lewis's acquaintance Toby Hassan Collins, who surfaced after the
trial as an alleged eyewitness.  As for Ground One's complaint
about the count of depraved indifference murder, Lewis first
mentioned this in 2004, more than two years after his conviction
became final.  He cited post-2002 decisions by the high court of
New York; however, that court has recently held that its post-
2002 decisions concerning depraved indifference murder do not
apply retroactively.  It is recommended that Judge Jones deny
Lewis's petition for a writ of habeas corpus.

FACTUAL AND PROCEDURAL BACKGROUND

The homicide occurred on December 17, 1993, at approximately
10:25 p.m., in a video game store located at 3429-B Eastchester
Road.  A man named Juzan "Pops" Bracey was shot three times in
the head and died.  Among those present was Strickland Steadman,
the store's owner.  He spoke with the police.  Four weeks later,
he reviewed a lineup and selected defendant Andre Lewis as the
person whom he had seen holding a revolver seconds before the
three shots were fired.

Lewis was 19 at the time of the shooting; his trial took
place almost three years later.  The only eyewitness who

3

testified during the trial was Steadman.

Steadman testified as follows:  Just before the shooting, six or seven customers (young men ranging in age from approximately 17 to 30) were in his store.  He was sitting behind the counter, with his back facing the door of his store, watching a television set in the back of the store.  (Tr. 100-101).  From behind him, he then heard the sound of a "raised voice" saying, in words or substance: "What's happening, man.  Tell me what's up.  Tell me something."  He turned around and saw that the person talking was someone he knew as "Pops," who was later identified as Juzan Bracey.  He had known Bracey from Bracey's previous visits to the store and from seeing him around the neighborhood.  (Tr. 102.)  Now Bracey was talking to other customers who were playing with a video game machine.  Steadman turned his head back toward the television, but continued to hear Bracey talk loudly -- so loudly that Steadman stood up, faced Bracey, and told him to keep his voice down.  (Tr. 103-104.)

Steadman then looked at defendant Lewis, an occasional patron, who had been in the store for about 30 minutes and was leaning on one of the video game machines, watching someone else play; in Lewis's right hand, Steadman now saw a gun -- it looked like a black .38 revolver.  (Tr. 104-105.)  When Steadman saw the revolver, he started walking to the back of his store.  About five or six seconds later, he heard a gunshot.  He then ran into a bathroom and heard two more gunshots fired.  He soon emerged from the bathroom; the store was empty except for Bracey, who was lying on the floor and bleeding from the head.  Steadman promptly went to a nearby taxi stand and told someone to call the police.  (Tr. 109-111.)

Police Officer George Cherry testified as follows:  He and his partner Police Officer Levanti were the first officers to arrive at the scene, at approximately 10:30 p.m.  He saw no one inside the store other than the corpse; outside the store, a large crowd gathered.  Officer Cherry "roped off the area in an effort to preserve any physical evidence that might be around[,]" for the detectives who would arrive later.  (Tr. 236, 237, 256-257.)  As part of his duties, he prepared a complaint report known as a UF61.  (Tr. 238.)  It contained descriptions of two persons, one of which was a description of the shooter, but he could not recall who gave him this description.  (Tr. 239-241.)  Defense counsel attempted to put this report into evidence, arguing that it constituted an exception to the hearsay rule; Justice Collins excluded it as hearsay.  (Tr. 247-251.)

Detective Thomas Signorelli, of the Crime Scene Unit,

testified as follows:  He investigated the scene of the homicide.
No weapon was found on the victim, or anywhere else within the
crime scene.  The victim held a five-dollar bill in his fist.
(Tr. 55).  Detective Signorelli took photographs of the crime
scene and the victim, which were received as evidence.  (Tr. 47-
49.)  He pointed out little black marks (stippling) in a close-up
photograph of the victim's wounds; he testified that stippling
"is the result of a close gunshot wound[,] . . . [i]t results
from the muzzle [of a gun] being within a close proximity to the
target."  (Tr. 52.)  On the hands and wrists of the victim, he
found no "blow back" (gunshot residue); this indicated that the
victim had not fired a gun.  (Tr. 68-69.)

     Detective Signorelli found latent fingerprints on the
exterior side of the front door of Steadman's store.  (Tr. 47,
63-64.)  He found these fingerprints in the center of the door,
on glass, which "[w]ould . . . be the normal place where someone
pushing the door [open] might place their hand."  (Tr. 65.)  On
cross-examination, he testified that a fingerprint made on glass,
if not smudged, can last for more than one day.  (Tr. 85.)
Detective Daniel Perruzza, of the Latent Print Unit, testified as
follows:  Of the four fingerprint cards received into evidence,
one matched an inked impression of Lewis's right palm.  (Tr. 163,
168-170.)  Defense counsel asked: "[A fingerprint] can last a
day, a week, a month, depending on the circumstances, correct?"
Detective Perruzza replied: "Depending on the conditions.  Yes,
sir."  (Tr. 178.)

     Jon Pearl, a physician employed by the Office of the Chief
Medical Examiner of the City of New York, testified as follows:
The Bracey autopsy was performed by Dr. Montas, a physician
employed by that same office, but she was on vacation at the time
of the trial.  Dr. Pearl did not perform the Bracey autopsy,
because he was performing another autopsy, but he was present in
the same room while Dr. Montas was performing the autopsy and
while she was dictating her findings.  (Tr. 182-183, 186-187.)
Over objection, the judge received Dr. Montas's report and Dr.
Pearl explained the report as follows:  There were three bullet
holes in Bracey's head.  Stippling occurred near two of the
wounds (one in the right ear, another above the right ear).  (Tr.
190-191.)  The third bullet hole was also found on the right side
of the head.  (Tr. 191.)  Fragments of the bullets were received
into evidence.  (Tr. 190-198.)

     Detective Anthony Tota, of the Ballistics Squad, testified
that, in his opinion, the three bullets were fired from the same
gun.  (Tr. 231-232.)

Detective Joseph Neenan, of the 47 Precinct Detective Squad, was the primary detective assigned to this homicide. He testified that after arriving at the scene of the crime, he interviewed Steadman and, to his knowledge, was the first officer to speak to Steadman. (Tr. 217-218.) One month later, on January 15, 1994, Detective Neenan arrested Lewis and placed him into a lineup. (Tr. 219-220.) Steadman testified that, on January 15, 1994, he viewed a lineup and identified Lewis as the person he had seen holding a revolver four weeks earlier. (Tr. 122, 150.)

No defense was presented at trial.

After closing arguments, Justice Collins delivered his charge to the jury. Among other things, he discussed the elements of the offenses alternatively charged, including (a) intentional murder; (b) depraved indifference murder; (c) manslaughter in the first degree; and (d) manslaughter in the second degree. (Tr. 367-378.) Justice Collins also told the jury how to assess the credibility and reliability of Steadman's identification of Lewis. (Tr. 378-381.)

At the conclusion of the charge, defense counsel came to the sidebar and requested a supplemental instruction "[t]hat identification is a particular part of each element that must be proven beyond a reasonable doubt." Justice Collins declined to give that supplemental instruction; he relied on the language already given to the jury. (Tr. 397-398.)

The jury was initially deadlocked, but Justice Collins noted that it had only been deliberating for about 4 hours; he directed the jury to continue to deliberate. (Tr. 409-410). On the next day, August 2, 1996, the jury found Lewis guilty of Count Two (depraved indifference murder). (Tr. 414-426.)

On November 19, 1996, Lewis moved to set aside aside the verdict, and claimed that he had recently discovered the existence of exculpatory witnesses. Justice Collins denied the motion after hearing extensive testimony, which will be described later. (Vol. 7, Tr. 12.)

On June 6, 1997, Justice Collins imposed an indeterminate term of imprisonment of 25 years to life. (Tr. 7, 28.)

On appeal, Lewis's appellate counsel, Kenneth M. Tuccillo, raised the following grounds:

1.    The verdict was against the weight of the evidence on the issue of identification.

6

2.    It was error to deny the motion for a new trial.

3.    The prosecutor's comments during summation were improper, and the court compounded the prejudice by providing inadequate instructions on reasonable doubt, lack of evidence and identification.

4.    It was reversible error to exclude, as hearsay, Officer Cherry's report containing a physical description given by an unnamed person at the crime scene.

5.    The sentence should be reduced because it may have been influenced by a claim by the prosecutor that Steadman's testimony had been confirmed, after the trial, by another witness (whose name the prosecutor did not supply at sentencing).

(Exh. 1.)  The Appellate Division unanimously affirmed and wrote:

The verdict was based on legally sufficient evidence and was not against the weight of the evidence.  There is no basis upon which to disturb the jury's determinations concerning identification.

After a thorough hearing, the court properly denied defendant's motion to set aside the verdict on the ground of newly discovered evidence.  The witness in question could have been located by defendant prior to trial through due diligence, in that the witness was in frequent contact with defendant's family.  Furthermore, there was no showing that his testimony would have probably affected the outcome of the trial, since the witness would have been impeached with a serious temporal discrepancy indicating that he could not have been present during the commission of the crime and since other witnesses to the incident testified he was, in fact, not present.

A police report which defendant sought to have admitted was properly excluded since the identity of the declarant who provided the description of the suspect was unknown to the maker of the report.  Without knowing the identity of the declarant, it was impossible

7

> to determine whether that person was under a
> business duty to communicate the information;
> therefore, the document did not fall within
> the business records exception to the hearsay
> rule.
>
> The record does not establish that
> defendant's sentence was based on any
> improper criteria and we perceive no basis
> for reduction of sentence.
>
> We have considered and rejected
> defendant's remaining claims.

*Lewis*, 284 A.D.2d at 172-73, 728 N.Y.S.2d at 432 (citations omitted).

Appellate counsel sought leave to appeal to the New York Court of Appeals, and raised the claims numbered above as 2 through 5. (Exh. 3.) Chief Judge Judith Kaye denied leave to appeal on January 10, 2002. *Lewis*, 97 N.Y.2d 706, 739 N.Y.S.2d 107.

One year later, in the first of his *pro se* motions for *coram nobis*, Lewis wrote:

> Appellate counsel was ineffective for
> failing to raise a meritorious issue of
> "actual innocence" when defendant-appellant's
> entire defense was based on "actual
> innocence." Appellate counsel was likewise
> ineffective for failing to present the
> constitutional nature of defendant
> appellant's claims on direct appeal; N.Y.
> Const., Art. I § 6; U.S. Const. Amends. VI
> and XIV.

(Exh. 5.) On August 14, 2003, the Appellate Division denied that motion. *Lewis*, 307 A.D.2d 1075, 764 N.Y.S.2d 673, *leave denied*, 1 N.Y.3d 540, 775 N.Y.S.2d 245.

In November 2003, Lewis sent his original habeas petition to the Court. On November 24, 2004, more than two years after his conviction became final, Lewis complained to the state courts, for the first time, that the count of depraved indifference murder had been improperly submitted to the jury. He raised this issue in his second *coram nobis* motion, which said:

> Appellate counsel was ineffective for
> failing to raise meritorious issue of trial
> counsel's failure to object to trial court's
> error in submitting inconsistent count of
> depraved indifference murder when the
> evidence point[ed] to intentional murder.
> This deprived Lewis of his right to effective
> assistance of appellate counsel.  U.S. Const.
> Amend. 6

(Exh. 7.)  The Appellate Division denied this motion.  (Exh. 10.)
Judge Ciparick ruled that the denial was not appealable. (Exh.
13.)

In September 2005, Lewis returned to the Court and filed an
amended petition with an accompanying memorandum of law.  He
relied heavily on a 2004 habeas opinion by Judge Gleeson in the
Eastern District of New York.  (Pet. Memo., pp. 28-29.)  However,
as will be seen, that opinion was based on a view of New York law
that turned out to be inaccurate in November 2006.

<u>DISCUSSION</u>

28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on
> behalf of a person in custody pursuant to the
> judgment of a State court shall not be
> granted with respect to any claim that was
> adjudicated on the merits in State court
> proceedings unless the adjudication of the
> claim --
>
> > (1) resulted in a decision that was
> > contrary to, or involved an
> > unreasonable interpretation of,
> > clearly established Federal law, as
> > determined by the Supreme Court of
> > the United States; or
> >
> > (2) resulted in a decision that was
> > based on an unreasonable
> > determination of the facts in light
> > of the evidence presented in the
> > State court proceeding.

In addition, a § 2254 petition will not be granted unless the
petitioner "has exhausted the remedies available in the courts of

the State."  § 2254(b)(1)(A).  Also, a petition "may be denied on the merits, notwithstanding the failure of the [petitioner] to exhaust the remedies available in the courts of the State."  § 2254(b)(2).

Ground 1:

Ground 1 appears to contain three arguments: (a) the conviction was against the weight of the evidence, (b) the evidence was insufficient as a matter of law, and (c) new evidence demonstrates actual innocence.

    a.   The weight of the evidence

This part of Ground 1 is merely an issue of state law. Under New York Criminal Procedure Law § 470.15(5), the Appellate Division is specially authorized to "weigh" the credibility of the trial evidence, much like a jury does.  *See Walton v. Ricks*, 2003 WL 1873607, at *6 (S.D.N.Y. Jan. 31, 2003) (McKenna, J.). Federal constitutional law has not recognized any equivalent to a New York claim about the "weight" of the evidence.  *See id.* at *7; *Howie v. Phillips*, 2004 WL 2073276, at *3 (S.D.N.Y. Sept. 17, 2004) (Sweet, J.).  Thus, to the extent Lewis argues that the trial evidence did not have strong credibility, he is not stating a valid ground for federal habeas relief.

    b.   Insufficiency as a matter of law; New York law concerning depraved indifference

It appears that Ground 1 intends to raise an alternative claim that the evidence, even if credible, was insufficient to support his conviction.  This is a claim pursuant to the Due Process Clause of the Fourteenth Amendment.  On direct appeal, his appellate attorney did not present that issue to the New York Court of Appeals in his July 9, 2001 leave letter.  (Exh. 3.)  In 2004, when Lewis raised this issue as ineffective assistance of appellate counsel, the Appellate Division rejected his claim. (Exh. 10.)

The "Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).  Referring to *Winship*, the Supreme Court later held that "it is clear that a state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to guilt beyond a reasonable doubt has stated a federal constitutional claim" for the purposes of

10

habeas corpus relief. *Jackson v. Virginia*, 443 U.S. 307, 321 (1979). However, a federal habeas court may not disturb a state conviction if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (italics in original).

"When it considers the sufficiency of the evidence of a state conviction, '[a] federal court must look to state law to determine the elements of the crime.'" *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 811 (2d Cir. 2000) (citation omitted).

At the time of the homicide in the case at bar (1993), New York Penal Law § 125.25(1) defined intentional murder as occurring when the defendant "[w]ith intent to cause the death of another person," caused the death of such person. N.Y. Penal Law § 125.25(1) (McKinney 1987). Under the New York Penal Law at that time, a person acted with intent "with respect to a result or to conduct described by a statute defining an offense when his <u>conscious objective</u> [was] to cause such result or to engage in such conduct." N.Y. Penal Law § 15.05(1) (McKinney 1987) (emphasis added).

New York Penal Law § 125.25(2) prohibited depraved indifference murder, which occurred when the defendant, "[u]nder circumstances evincing a depraved indifference to human life, . . . recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person[.]" N.Y. Penal Law § 125.25(2) (McKinney 1987). The term "recklessly" carried the following statutory definition at that time:

> A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts recklessly with respect thereto.

N.Y. Penal Law § 15.05(3) (McKinney 1987).

Lewis's conviction became final on April 10, 2002.  During the entire period from 1983 through 2002, judges frequently presented a jury with both types of murder discussed above and allowed the jury to choose either one as the possible basis of a finding of guilt.  *See People v. Register*, 60 N.Y.2d 270, 274, 469 N.Y.S.2d 599, 600 (Ct. App. 1983); *People v. Gallagher*, 69 N.Y.2d 525, 528-29, 516 N.Y.S.2d 174, 175 (Ct. App. 1987); *People v. Sanchez*, 98 N.Y.2d 373, 748 N.Y.S.2d 312 (Ct. App. July 9, 2002).

However, starting in June 2003, the New York Court of Appeals began to limit that practice.  *People v. Hafeez*, 100 N.Y.2d 253, 259, 762 N.Y.S.2d 572, 575 (Ct. App. June 10, 2003) (holding that when "the actions of both defendants were focused on first isolating, then intentionally injuring the victim . . . there exists no valid line of reasoning that could support a jury's conclusion that defendant possessed the mental culpability required for depraved indifference murder").  *People v. Gonzalez*, 1 N.Y.3d 464, 469, 775 N.Y.S.2d 224, 228 (Ct. App. Mar. 25, 2004) (in instances where a depraved indifference murder count is "unsupportable as a matter of law," a trial court errs by allowing a jury to consider it).  *People v. Payne*, 3 N.Y.3d 266, 270, 786 N.Y.S.2d 116, 117 (Ct. App. Oct. 19, 2004) ("This Court's recent holdings . . . have made it clear that depraved indifference murder may not be properly charged in the overwhelming majority of homicides that are prosecuted in New York.  While we have identified instances in which a killing could qualify as depraved indifference murder, a point-blank shooting is ordinarily not one of them.").  *People v. Suarez*, 6 N.Y.3d 202, 207, 811 N.Y.S.2d 267, 271 (Ct. App. Dec. 22, 2005) (per curiam) ("The proliferation of the use of depraved indifference murder as a fallback theory under which to charge intentional killers reflects a fundamental misunderstanding of the depraved indifference murder statute.").

In September 2004, Judge Gleeson granted habeas to a New York prisoner named Policano.  Judge Gleeson relied on the March 2004 *Gonzalez* decision.  Even though Policano was tried in 1998 and his conviction became final in 2001, Judge Gleeson opined that *Gonzalez* merely reaffirmed principles that had been stated back in 1987 in *Gallagher*.  *Policano v. Herbert*, 2004 WL 1960203, at *6 (E.D.N.Y. Sept. 4, 2004) (Gleeson, J.).

Judge Gleeson's decision was originally affirmed by a panel of the Second Circuit.  430 F.3d 82 (2d Cir. 2005).  On June 21, 2006, a majority of the Second Circuit's active judges denied a petition for rehearing *en banc*, but Judge Raggi's dissent raised the question of whether the high court of New York intended

*Gonzalez* to apply retroactively.  453 F.3d 79.  Also on June 21, 2006, the original Second Circuit panel certified certain questions to the high court of New York.  453 F.3d 75.

Those questions were answered on November 16, 2006.  The New York Court of Appeals wrote:

> . . . [U]nder [the] *Register* [formulation,]. . . whe[n] both intentional and depraved indifference murder were charged in one-on-one shootings or knifings, these counts were submitted to the jury for it to sort out the defendant's state of mind unless there was absolutely no evidence whatsoever that the defendant might have acted unintentionally.  That a defendant's acts virtually guaranteed the victim's death did not, in and of itself, preclude a guilty verdict on a theory of depraved indifference.  To the contrary[,] . . . under the *Register* formulation the very facts establishing a risk of death approaching certainty and thus presenting compelling circumstantial evidence of intent -- for example, a point-blank shooting of the victim in the head -- likewise demonstrated depraved indifference.  This was the law of the State of New York at the time [Policano's] conviction became final [in 2001].

> . . . . *Register* states the correct interpretation of the law of New York with respect to the elements of depraved indifference murder on the date [Policano's] conviction became final in 2001.  Our interpretation of one of those elements -- "under circumstances evincing a depraved indifference to human life" -- gradually and perceptibly changed from an objectively determined degree-of-risk standard (the *Register* formulation) to a mens rea, beginning with our decision in *Hafeez* in [June] 2003, continuing in our decisions in *Gonzalez*, *Payne* and *Suarez* in 2004 and 2005, and ending with our decision in [*People v. Feingold*, 7 N.Y.3d 288, 819 N.Y.S.2d 691] in 2006. . . .  [I]ndividual judges hold differing views as to where along this

13

trajectory a majority of the Court may have
effectively passed the point of no return --
the limit beyond which, hard as we may have
tried, it was simply not possible to
reconcile our developing case law with
*Register* and *Sanchez*. . . .   This raises the
question whether our post-*Sanchez* [*i.e.* post
June 2002] case law applies retroactively to
defendant's case, an issue that Judge Raggi
in her dissent intimates that we may wish to
address.   We conclude that it does not.

Under *People v Pepper* (53 NY2d 213
[1981]), we must weigh three factors to
determine whether a new precedent operates
retroactively:   the purpose to be served by
the new standard; the extent of the reliance
by law enforcement authorities on the old
standard; and the effect on the
administration of justice of a retroactive
application of the new standard.   The second
and third factors are, however, only given
substantial weight "when the answer to the
retroactivity question is not to be found in
the purpose of the new rule itself" (*id.* at
220, citing *Desist v United States*, 394 US
244, 249 [1969]).   "Thus, where otherwise
there could be a complete miscarriage of
justice, current constitutional standards
that go to the heart of a reliable
determination of guilt or innocence have been
substituted for those in effect at the time
of trial" (*Pepper*, 53 NY2d at 221).

This is not such a case.   The purpose of
our new interpretation of "under
circumstances evincing a depraved
indifference to human life" is to dispel the
confusion between intentional and depraved
indifference murder, and thus cut off the
continuing improper expansion of depraved
indifference murder.   Moreover, in the words
of the concurring Judges in *Suarez*, the goal
is to "make future homicide prosecutions more
sustainable, increasing the likelihood that
defendants who are proven beyond a reasonable
doubt to have committed intentional murder
will be properly held to account for that

14

crime" (*Suarez*, 6 N.Y.3d at 217).  Further,
"[d]efendants who commit[ ] vicious crimes
but who may have been charged and convicted
under the wrong section of the statute are
not attractive candidates for collateral
relief after their convictions have become
final" (*id.* at 217-218).  In short,
nonretroactivity poses no danger of a
miscarriage of justice.

     Finally, the other two *Pepper* factors
strongly favor nonretroactivity.  For two
decades prosecutors relied on *Register*'s
objectively determined degree-of-risk
formulation when making their charging
decisions (*see Sanchez*, 98 NY2d at 387
[Appendix]).  In addition, retroactive
application would potentially flood the
criminal justice system with CPL 440.10
motions to vacate convictions of culpable
intentional murderers who were properly
charged and convicted of depraved
indifference murder under the law as it
existed at the time of their convictions.

*Policano v. Herbert*, 7 N.Y.3d at 600-04, 825 N.Y.S.2d at 687-90
(Ct. App. 2006).

     Therefore, with respect to any conviction that became final
prior to *Sanchez* (*i.e.*, July 9, 2002), the law of New York was
and is as follows:

     (a)  If a defendant was accused of killing someone with a
point blank shot to the head, it was not improper to present the
jury with two alternatives: intentional murder under § 125.25(1),
and depraved indifference murder under § 125.25(2);

     (b)  Despite evidence of an execution-style homicide, it was
possible for a jury to find, beyond a reasonable doubt, that the
defendant committed all of the elements of depraved indifference
murder under § 125.25(2).

     In the case at bar, a rational jury could have found, beyond
a reasonable doubt, that Lewis (1) recklessly engaged in conduct
(2) which created a grave risk of death to Bracey (3) thereby
causing the death of Bracey (4) under circumstances evincing a
depraved indifference to human life.  *See Policano*, 7 N.Y.3d at
602, 825 N.Y.S.2d at 688.  Thus, even if Lewis's original 2003

habeas petition had objected to submitting the depraved
indifference count to the jury, the Court would still have to
overrule such an objection in view of the 2006 *Policano* decision,
which gives a definitive statement of the New York law on
depraved indifference murder during the period from 1983 through
July 9, 2002.[1]

> c.  <u>The claim that new evidence demonstrates actual
>     innocence</u>

> (i) <u>The post-verdict evidentiary hearing</u>

On November 19, 1996, Lewis filed a motion to set aside
aside the verdict based on newly discovered evidence.  On April
15, 16, 29, and May 14, 1997, Justice Collins held an evidentiary
hearing.  (The hearing testimony is in Volumes 4, 5, and 6; the
decision is in Volume 7.)  At that hearing, Lewis was represented
by Timothy P. Alnwick.

The first witness was Toby Hassan Collins (He will be
referred to as "Hassan Collins" to avoid confusion with Justice
Collins).

Hassan Collins testified as follows:  He had known Lewis
because he had been in junior high school with Lewis and had seen
Lewis at parties.  In December 1993, he was employed as a
security guard in Manhattan and he had been in Steadman's store
on the day of the shooting, arriving there approximately between
8:30 p.m. and 9:00 p.m.  (Vol. 4, Tr. 8-11, 35.)  While he was in
Steadman's store, playing a video game, he saw two or three other
people in the store.  He then went outside and smoked a
cigarette.  When he came back into the store, he did not see any
employees or the manager of the store.  He then saw two men come
into the store and heard them arguing about money.  One of those
men was Bracey.  The other was "Tony Crackhead," who was short
(5'4" or 5'5") and was wearing a black hat and a blue coat.

At the hearing, Hassan Collins further testified as follows:
He saw "Tony Crackhead" shoot Bracey, and Lewis was nowhere in
sight.  (Vol. 4, Tr. 12-15, 20, 26.)  Hassan Collins ran home and
told members of his family what had happened.  He did not bring
it to the attention of the police; he had wanted to stay away
from the courts due to a previous prosecution in which the

---

[1]  The Second Circuit has ordered the parties in *Policano* to
submit supplemental briefs; it has not yet issued a further
ruling.  *See* docket sheet in *Policano*, No. 04-5518 (2d Cir.).

charges against him were eventually dismissed, and due to a
perception that cooperation with a defendant might hinder his
career goal of finding employment in law enforcement.  Sometime
after the January 1994 arrest of Lewis, Lewis's brother informed
Hassan Collins that Lewis was charged with murder.  According to
Hassan Collins, he was not notified about the 1996 jury verdict
until approximately November or December 1996.  (Vol. 4, Tr. 57-
58.)

At trial, Steadman had placed the time of the shooting
around 10:30 p.m.; he testified that he promptly told someone to
call the police; Officer Cherry said he and his partner were the
first to arrive at approximately 10:30 p.m.  By contrast, at the
April 15, 1997 hearing, Hassan Collins testified that the
December 1993 shooting occurred earlier, between 9:00 p.m. and
9:30 p.m.  He estimated that he arrived home between 9:45 p.m.
and 9:50 p.m.  He then traveled for an hour from his home to his
job in Manhattan, which began at 11:00 p.m. on the evening of the
shooting.  He testified that he could not remember the time he
arrived at work, but that he did not remember arriving at work
late.  (Vol. 4, Tr. 35-39.)

At the hearing, the next witness was the store owner
Steadman.  ADA Hrabsky asked:

> Q: Mr. Steadman, calling you back to
> December 17, 1993, at about twenty
> minutes after ten, did you see [Hassan
> Collins] in your store?
>
> A: No.
>
> Q: And, during the approximate twenty
> minutes or so before this incident
> happened, did you see . . . Hassan
> Collins in your store?
>
> A: I didn't see him.

(Tr. 4, 83.)

The next witness was Kuweuan Burgess; in exchange for his
cooperation, ADA Hrabsky offered to write a favorable letter to
the parole board for him.  Burgess's testimony was as follows:
On the date of the shooting, between 10:20 p.m. and 10:30 p.m.,
Burgess was selling drugs near Steadman's store.  He saw Juzan
Bracey enter the store by himself, not with "Tony Crackhead" --
Burgess knew both men.  A few minutes later, Burgess heard one

17

shot, then a few shots.  Then people came running out, including Lewis and another man named "Dee."  Burgess knew Lewis as a fellow drug seller.  Burgess had never seen Hassan Collins until the post-trial hearing, and he did not recall seeing Hassan Collins on the date of the shooting.  (Vol. 4, Tr. 94-104.)

The defense then called Michelle Burke, who testified as follows:  From a location across the street from the store, she saw Hassan Collins go into the store at around 10:00 p.m. on the date of the shooting, and later that night, she saw a crowd of people in front of the store.

The next witness was Detective Neenan, who testified as follows:  To the best of his knowledge, the homicide occurred at 10:25 p.m.  (Vol. 6, Tr. 10.)  On the morning after the homicide, he had identified the shooter as Lewis.  (Vol. 6, Tr. 12.)  In the community where the homicide occurred, it was well known that Lewis was charged with murder.  Detective Neenan had previously arrested "Tony Crackhead" on some other charge; he knew that the real name of "Tony Crackhead" was Johnson Edwards.  (Vol. 6, 12-13.)  At no time during his investigation of the homicide did he receive any information from anyone that would suggest that "Tony Crackhead" was in the area of the shooting on the night of the shooting.  Detective Neenan arrested Lewis for the shooting. Lewis denied shooting the victim, but admitted that he was in the store prior to the shooting, and that he was in the store after the shooting; Lewis did not reveal where he was during the shooting.  (Vol. 6, 13-14.)  During cross-examination, Detective Neenan acknowledged that he never interviewed Hassan Collins with regard to the homicide.  (Vol. 6, Tr. 16.)

Hassan Collins was recalled to the stand by the defense, and his further testimony was as follows:  He temporarily lived in South Carolina beginning in the Spring of 1994 until sometime in 1995.  (Vol. 6, Tr. 20.)  He resided in South Carolina in December 1996, but on December 10, 1996, he was in New York to take the New York City Correction Officer's examination.  (Vol. 6, Tr. 22-23.)

On June 6, 1997, Justice Collins delivered an oral opinion (Vol. 7, Tr. 2-12), and denied the motion to set aside the verdict.  He found that Steadman and Burgess were credible, and that Hassan Collins and Michelle Burke were not.  He also found that Hassan Collins's testimony had been discoverable before the July 1996 trial by the exercise of due diligence, and that Hassan Collins's testimony would not change the result if there were a retrial.  (Vol. 7, Tr. 7-11.)  On that issue, the Appellate Division wrote:

> After a thorough hearing, the court properly
> denied defendant's motion to set aside the
> verdict on the ground of newly discovered
> evidence.  The witness in question could have
> been located by defendant prior to trial
> through due diligence, in that the witness
> was in frequent contact with defendant's
> family.  Furthermore, there was no showing
> that his testimony would have probably
> affected the outcome of the trial, since the
> witness would have been impeached with a
> serious temporal discrepancy indicating that
> he could not have been present during the
> commission of the crime and since other
> witnesses to the incident testified he was,
> in fact, not present.

*Lewis*, 284 A.D.2d at 172-73, 728 N.Y.S.2d at 432 (citations
omitted).  Lewis has utterly failed to show that this was "an
unreasonable determination of the facts in light of the evidence
presented in the State court proceeding."  § 2254(d)(2).  As one
example, I would point out that Hassan Collins's testimony
included the unlikely proposition that the owner of the video
game store left it open, but unattended, for a lengthy period of
time beginning at about 9:00 p.m.  (Tr. 4, 12-16.)

(ii)  <u>The heavy burden imposed on a habeas petitioner
      who claims actual innocence</u>

   "'Actual innocence' in habeas jurisprudence refers to a
means by which petitioners can avoid certain procedural bars to
having their habeas petitions considered on the merits."
*Alexander v. Keane*, 991 F.Supp. 329, 334-35 (S.D.N.Y. 1998).
"The judicial system finds unconstitutional incarceration so
repugnant that if actual innocence can be demonstrated then it
overrides procedural bars such as exhaustion and procedural
default."  *Hood v. Woods*, 2007 WL 542134, at *3 (N.D.N.Y. Feb.
16, 2007) (Scullin, J.).  However, "prisoners asserting [actual]
innocence as a gateway to defaulted claims must establish that,
in light of new evidence, 'it is more likely than not that no
reasonable juror would have found petitioner guilty beyond a
reasonable doubt.'"  *House v. Bell*, 126 S.Ct. 2064, 2076-77
(2006) *quoting Schlup v. Delo*, 513 U.S. 298, 327 (1995).  Lewis
utterly fails to meet the heavy burden required by *Schlup* and
*House*.

<u>Ground 2:  Misconduct in the prosecutor's summation</u>

"[P]rosecutorial misconduct may so infect the trial with unfairness as to make the resulting conviction a denial of due process." *Greer v. Miller*, 483 U.S. 756, 765 (1987) (internal quotation marks, citation, and alteration omitted).  "To constitute a due process violation, [however,] the prosecutorial misconduct must be of sufficient significance to result in the denial of defendant's right to a fair trial." *Ibid.* (citation and internal quotation marks omitted).  To determine whether prosecutorial misconduct has taken place, the prosecutor's alleged misdeeds must be placed in context, and "[t]he severity of the misconduct, curative measures, and the certainty of conviction absent the misconduct are all relevant to the inquiry." *Blisset v. Lefevre*, 924 F.2d 434, 440 (2d Cir. 1991).  With those standards in mind, we now turn to Lewis's three complaints about the prosecutor's summation.

In his summation for the defense, Joseph Colarusso argued that the entire case "c[ame] down to only one witness, Mr. Steadman."  (Tr. 283.)  He noted that Steadman claimed to have heard shots but not to have seen them.  He argued that Steadman was mistaken with regard to his testimony that he saw Lewis with a gun in his hand prior to the shooting, and therefore his identification of Lewis in court was unreliable. (Tr. 287-299, 301-302.)  In speaking of Steadman's in-court identification of Lewis, Mr. Colarusso said: "Who else is he gonna identify?  I mean, Ray Charles could identify the defendant in court.  Okay?  Let's face it.  Of course, he's going to identify him in court." (Tr. 299.)  Mr. Colarusso challenged the validity of the lineup identification.  (Tr. 299-300.)  He questioned Officer Cherry's inability to recall the declarant who related a physical description of the shooter.  (Tr. 305.)  He also questioned Detective Tota's opinion that the bullets found in the victim were all fired from the same gun.  (Tr. 310-311.)  He argued that Dr. Pearl's testimony and Dr. Montas's autopsy report were unreliable because Dr. Pearl did not perform the autopsy and because Dr. Montas failed to appear to testify at trial.  (Tr. 312-313.)  Mr. Colarusso ended his summation by arguing to the jury, "based on the lack of evidence, based on the unreliability of Mr. Steadman's testimony[,] . . . you cannot have proof beyond a reasonable doubt in this case and . . . you should find [Lewis] not guilty."  (Tr. 318.)

ADA Hrabsky began his summation by saying that Mr. Colarusso's summation had amounted to "a lot of dust being thrown in the air[.]"  Mr. Colarusso then objected, but was overruled by Justice Collins.  (Tr. 320.)  ADA Hrabsky argued the following to

20

the jury:

> I presented witnesses to you, ladies and
> gentlemen.  I put up there Mr. Steadman. [Mr.
> Colarusso] attacks Mr. Steadman.  Detective
> Signorelli, he's Crime Scene.  He takes
> photographs.  Here.  Look.  So he attacks
> Detective Signorelli.  Doctor Pearl is nice
> enough to come in because Doctor Montas is on
> vacation.  He attacks Doctor Pearl.  What is
> this? . . .  He attacks me.

(Tr. 321-322.)  Mr. Colarusso again objected, but Justice Collins
overruled him.  (Tr. 322.)

On three occasions during his summation, ADA Hrabsky
described Steadman as a "honest man."  (Tr. 326, 330, 331.)  On
the third occasion, Mr. Colarusso objected that ADA Hrabsky was
"vouching," but his objection was overruled.  (Tr. 331.)

ADA Hrabsky also argued:

> I look at this photograph, I see only one
> large pool of blood which means Juzan Bracey
> never moved.  I asked the medical examiner
> which bullet killed him.  He said all of
> them, any one of them killed him.  So that
> means the [one] to the top of the head,
> ladies and gentlemen, killed him.  The other
> two are what we call insurance. . . .  That
> first wound to the head when he dropped down
> is now in such a position that it had to be
> first.  Remember I started this off with
> saying it shows the presence of mind of . . .
> Lewis.  The presence of mind was that he
> walked over . . . to Juzan Bracey, then
> executed him with two more shots to the head
> so that we wouldn't be able to have someone
> alive to testify against him; so we wouldn't
> be able to have someone here to tell us what
> the motive was.  That's what he did. . . .
> He shot him, went over to him and executed
> him; two close range shots right next to each
> other.  That's what he did.

(Tr. 340-341.)

Mr. Colarusso objected, saying that such statements called for

speculation.  However, Justice Collins ruled that it was ADA
Hrabsky's "argument to make to the jury" and that "[t]he jury is
free to accept or reject it as they see fit."  (Tr. 342.)  ADA
Hrabsky later stated:

> This is an act of depravity as well as based
> upon your determination, take your pick, did
> he intend to kill him or did he do it as an
> act of extreme depravity?  That's for you to
> decide. . . .  Seems to me you would reach
> the conclusion there was an intent to kill
> here from that evidence.

(Tr. 345-346.)

Finally, ADA Hrabsky argued that the defense summation
included an erroneous comment about the law:

> He [Mr. Colarusso] said if you have a one
> single reasonable doubt then you must acquit.
> Ladies and gentlemen, listen to the judge's
> charge on the law.  I have to prove the
> elements of the crime.  At the end of this
> case his Honor is going to submit four
> different crimes to you.  You could have a
> reasonable doubt about the crime of
> intentional murder and still find [Lewis]
> guilty of the crime of depraved
> [indifference] murder so what counsel said is
> wrong.  You can have a reasonable doubt.

(Tr. 348.)

Mr. Colarusso again objected.  Justice Collins stated that ADA
Hrabsky was giving his understanding of the defense argument, and
was entitled to put it to the jury as he understood it.  (*Id.*)

    a.   <u>The claim that the prosecutor vouched for Steadman's
credibility</u>

Lewis suggests that ADA Hrabsky committed prosecutorial
misconduct during his summation by "vouching for the credibility
of his main witness [Steadman]."  (Pet. Memo. at 1, ¶ 2.)  A
significant portion of Mr. Colarusso's defense summation was
devoted to attacking the credibility of Steadman.  (Tr. 284, 287-
303, 311, 315.)  ADA Hrabsky responded to that attack by
repeatedly referring to Steadman as a "honest man" and referring
to his testimony as "the truth."  (Tr. 326, 330, 331, 338.)

This is acceptable under New York law. *E.g., Simms v. Moscicki*, 2006 WL 2466811, *19 (S.D.N.Y. Aug. 25, 2006) (Peck, M.J.) ("Under New York law, where defense counsel attacks the credibility of one of the prosecution's witnesses, a prosecutor's comments on summation that the witness *was* credible constitute a fair response to remarks made by the defense counsel during summation and generally are not considered improper vouching.") (italics in original) *report and recommendation adopted in* 2007 WL 162295 (S.D.N.Y. Jan. 19, 2007) (Cote, J.). Similarly, in federal trials, "[p]rosecutors have greater leeway in commenting on the credibility of witnesses when the defense has attacked that credibility." *United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998).

    b.   <u>The claim that the prosecutor misstated the burden of proof</u>

Lewis also appears to assert that ADA Hrabsky erred by misstating his burden to prove each element of the crime beyond a reasonable doubt. Lewis was charged with four offenses in the alternative: intentional murder, depraved indifference murder, manslaughter in the first degree, and manslaughter in the second degree. (Tr. 269-70, 367-68.) ADA Hrabsky told the jury that it could find reasonable doubt as to one offense, but still could convict Lewis of another offense. This seems to have been an accurate statement of New York law. *See Gallagher*, 69 N.Y.2d at 529-30, 516 N.Y.S.2d at 175-76 (holding that a defendant cannot be found guilty of both intentional murder and depraved indifference murder).

    c.   <u>The prosecutor's statements about the significance of lack of evidence</u>

ADA Hrabsky characterized Mr. Colarusso's summation as "a lot of dust . . . thrown in the air." (Tr. 320.) Later, he said the defense was "blowing smoke" when it argued about the physical description in Officer Cherry's report. (Tr. 323-324.) However, "[t]he prosecutor['s] argument did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused . . . . Much of the objectionable content was invited by or was responsive to the . . . summation of the defense." *Darden v. Wainwright*, 477 U.S. 168, 181-82 (1986) (internal citation omitted). Justice Collins instructed the jury that it was

> to find the facts only upon the evidence
> produced by both sides in this courtroom.
> [E]vidence; testimony, exhibits introduced in
> evidence, stipulations. Remember what the

                    lawyers say at any time during the trial is
                    not evidence . . . .  Arguments or opinions
                    expressed by counsel are not evidence.

(Tr. 365.)

     Thus, the prosecutor's summation did not amount to a denial
of due process.

Ground 2A:  The judge's charge to the jury

     Lewis argues that Justice Collins "compounded the prejudice
. . . by providing improper instruction on reasonable doubt, lack
of evidence and identification."  (Pet. Memo., p. 1, ¶ 2A.)
Lewis also alleges that Justice Collins "refused to instruct the
jury that identification must be proven beyond a reasonable
doubt."  (*Id.* at p. 33.)  Lewis says that Mr. Colarusso "had
initially made the request to the judge to instruct the jury
[that] identification need[ed] to [be] proven beyond a reasonable
doubt, yet, his request was denied . . . ."  (*Id.* at p. 34.)
Lewis claims that Justice Collins "ambiguously connected the
standards of proving Petitioner's guilt beyond a reasonable
[doubt] with the standard of sufficiency of the identification
thus, providing the jury with a totally erroneous statement of
the law."  (*Id.*)

     "For an erroneous state jury charge to result in a federal
constitutional deprivation, 'the ailing instruction by itself
[must have] so infected the entire trial that the resulting
conviction violates due process.'"  *Blazic v. Henderson*, 900 F.2d
534, 541 (2d Cir. 1990) *quoting Cupp v. Naughten*, 414 U.S. 141,
147 (1973) (alteration in original).  Also, every instruction to
the jury contained within the jury charge must be viewed in the
context of the overall charge.  *DelValle v. Armstrong*, 306 F.3d
1197, 1201 (2d Cir. 2002) *quoting Cupp*, 414 U.S. at 146-47.

     a.  Reasonable doubt and identification

     Lewis claims that Justice Collins's jury charge was improper
in that it failed to instruct the jury "on identification being
need[ed] to [be] proven beyond a reasonable doubt[.]"  (Pet.
Memo., at 34.)  The Supreme Court has held that due process
requires that an accused must be proven to have fulfilled all of
the elements of the offense charged, beyond a reasonable doubt.
*See In re Winship*, 397 U.S. at 364.  "Because our system entrusts
the jury with the primary responsibility of implementing the
substantive protections promised by the reasonable doubt
standard, reasonable doubt jury instructions which appropriately

                                   24

convey *Winship* concepts are critical to the constitutionality of a conviction." *United States v. Doyle*, 130 F.3d 523, 535 (2d Cir. 1997).

Justice Collins instructed that each element of the crime charged must be proved beyond a reasonable doubt. (Tr 351-352.) He then listed the essential elements of each count. (Tr. 352-353, 367-379, 385-89.) In addition, he specifically told the jury that the prosecution "must prove beyond a reasonable doubt that the crime charged was actually committed. But more than that, the [prosecution] must also prove beyond a reasonable doubt that *the defendant* committed that crime." (Tr. 379, emphasis added.) At the conclusion of the charge, defense counsel came to the sidebar and requested a supplemental instruction "[t]hat identification is a particular part of each element that must be proven beyond a reasonable doubt." Justice Collins declined to give that supplemental instruction; he relied on the language already given to the jury. (Tr. 397-398.)

It is found that defense counsel's request was unnecessary, and that the judge's jury instruction was already sufficient to "appropriately convey *Winship* concepts."

b.  Use of phrase "lack of evidence"

Lewis also appears to assert that Justice Collins's instruction regarding reasonable doubt and lack of evidence was improper. At page 32 of his memorandum, Lewis appears to be complaining about the judge's use of the phrase "lack of evidence." Justice Collins, in discussing the reasonable doubt standard in his jury instructions, stated:

> If based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty of the crime charged. If on the other hand, based upon the evidence or *lack of evidence* it is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty. Each element of any crime charged as I will define it must be proved beyond a reasonable doubt. Now, when I say that you must evaluate the evidence or *lack of evidence*, I am not telling you that you can or that you should speculate about what other steps could have been taken in this case or what other kinds of evidence might have or could have

been presented to you.  Do not consider what
might have been done or what could have been
done or what else you would have done.  The
law does not require the People to produce
any particular kind of evidence but it does
require that whatever evidence they do
present convinces you beyond a reasonable
doubt of the defendant's guilt.  So when I
say that you should evaluate the evidence or
*lack of evidence*, I mean by the *lack of
evidence* that if you find that without other
or additional evidence, that the evidence
that the People have offered fails to
establish the defendant's guilt beyond a
reasonable doubt, then you should find that
the People have not met their burden of
proof.

(Tr. 351-353, emphasis added.)

There is nothing improper in that instruction.

Ground 3:  The judge's refusal to allow the jury to see the
physical description given by an unknown declarant

Under New York law (in particular, under § 4518(a) of the
New York Civil Practice Law and Rules), there is a business
records exception to the hearsay rule if "(1) the entrant of
those facts was the witness, or (2) the person giving the entrant
the information was under a business duty to relate the facts to
the entrant." *Lynn v. Bliden*, 443 F.3d 238, 252 (2d Cir. 2006)
(citation and internal quotation marks omitted), *cert. denied*,
127 S.Ct. 1383 (2007).  Officer Cherry made the entries in the
police report, which contained a physical description of the
shooter, but Officer Cherry was not a "witness" who had seen the
shooter.  He was given information from someone at the crime
scene, but he nether wrote nor recalled the identity of that
declarant.  (Tr. 238-247.)  Accordingly, the Appellate Division
ruled:

A police report which defendant sought to
have admitted was properly excluded since the
identity of the declarant who provided the
description of the suspect was unknown to the
maker of the report.  Without knowing the
identity of the declarant, it was impossible
to determine whether that person was under a
business duty to communicate the information;

26

> therefore, the document did not fall within
> the business records exception to the hearsay
> rule.

*Lewis*, 284 A.D.2d at 173, 728 N.Y.S.2d at 432.

"A defendant has the constitutional right to introduce a secondary form of evidence such as [hearsay] when two circumstances are present:  first, the evidence bears sufficient indicia of reliability, and second, [the source of the hearsay] is no longer available." *Rosario v. Kuhlman*, 839 F.2d 918, 924 (2d Cir. 1988) (internal citations omitted).  Lewis appears to claim that he was 5'10" tall at the time of the shooting, whereas the report described the shooter as 5'4".  (Pet. Memo., at 35.)  However, the report did not explain who the declarant was, or from what vantage point the declarant observed the shooter, or whether the declarant was merely passing along some hearsay from someone else.  Hence, the police report lacked the "sufficient indicia of reliability" required by the Second Circuit.

Ground 4:  The sentencing

a.  Excessive sentence

"No federal constitutional issue is presented when . . . the sentence is within the range prescribed by state law." *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) (per curiam).  On the date of the homicide, the New York Penal Law defined Murder in the Second Degree as a A-I felony.  N.Y. Penal Law § 125.25 (McKinney 1987).  The maximum term of imprisonment for an offense such a Murder in the Second Degree, at that time, was life imprisonment, and the minimum term of imprisonment was, at that time, not less than 15 years nor more than 25 years.  *See* N.Y. Penal Law § 70.00(2)(a), (3)(a)(i)(McKinney 1987).  Lewis was sentenced to 25 years to life, which was *within* the range prescribed by state law at that time.  Therefore, to the extent Lewis alleges that his sentence is excessive, he presents no federal constitutional issue.

b.  The prosecutor's statement during the sentencing phase

Lewis's Ground Four complains that, at sentencing, the prosecutor told the judge that he had found a new witness who corroborated the trial testimony.  Respondent's memorandum says that the challenged statement occurred at pages 18-19 of the sentencing transcript.  That was a few pages after Justice Collins (a) evaluated the witnesses who testified at the post-trial hearing, and (b) stated his reasons for denying a new

trial.  According to Respondent, at this point (just before the imposition of sentence) ADA Hrabsky said:

> I would also like to put on the record, Judge, that that investigation hasn't stopped, and I want to advise this Court at this time and Counsel for his own edification that I have since found another witness, a witness who I believe was in the store and has been in my office and has told me, in no uncertain terms, that Andre Lewis is the one that this witness saw pull the trigger and shoot Juzan Bracey.

(Resp. Memo. at 36).  Pages 18 and 19 are missing from my copy of the sentencing transcript, but Lewis's traverse does not dispute the accuracy of the above quotation.  To reopen the sentencing, Lewis would have to show that it is "quite probable" that the judge relied on false information in imposing sentence.  *King v. Hoke*, 825 F.2d 720, 724 (2d Cir. 1987).  However, Lewis has not shown that the information was false.  He merely notes the obvious fact that the alleged witness never answered questions from defense counsel or from the judge.  Moreover, it is not "probable" that this information affected the sentence.  The sentence was amply justified by the eyewitness testimony of Steadman, who had just testified again at the post-trial hearing.  Moreover, at that hearing, Kuweuan Burgess had given testimony (with cross-examination) that strongly corroborated Steadman's testimony.


## CONCLUSION AND RECOMMENDATION

For the reasons set forth above, it is recommended that Judge Jones deny Lewis's habeas petition.  Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, any party may object to this report and recommendation within 10 business days after being served with a copy of it (*i.e.*, no later than October 5, 2007) by mailing a copy of such objections to the adversary and mailing the original of such objections to the Clerk of the U.S. District Court, with courtesy copies for both myself and Judge Jones.  Failure to file objections within 10 business days will preclude appellate review.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1999) (per curiam); *see* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), and 6(e).  Any request for an extension of time must be addressed to Judge Jones.

addressed to Judge Jones.

_Douglas F. Eaton_

DOUGLAS F. EATON
United States Magistrate Judge
Room 1360, U.S. Courthouse
500 Pearl Street
New York, NY 10007

Dated:      September 20, 2007
            New York, New York


Copies of this Report and Recommendation are being sent to:

Andre Lewis
97A4258
Green Haven Correctional Facility
Stormville, NY 12582

Christopher J. Blira-Koessler, Esq.
Peter D. Coddington, Esq.
Bronx County District Attorney's Office
198 East 161st Street
Bronx, NY 10451

Hon. Barbara S. Jones
U.S. District Judge
Room 620, U.S. Courthouse
500 Pearl Street
New York, NY 10007


29